I thought it was fortuitous that this is scheduled during the March of Madness for a couple of reasons. Not because I just did with MAD, but because it talks about rules and I was thinking in my argument I was going to talk about how it's important that when they take the court in a basketball game that everybody plays by the same rules. So if the team you favor commits a foul, then that's a foul. If the team you don't like commits a foul, then that's a foul for everybody. In this case, when Mike Rasmussen stepped in court, instead of basketball in a court of law, he was faced with a different set of rules for him. And the reason, and it might be sympathetic to a lot of people, because he admitted committing a sexual assault on his two adopted children and he was convicted of that, accepted responsibility and was sentenced so that he at this point would not get out of prison probably until 2013, 67 years old. But when you're in that court, unlike the criminal court, the rules are supposed to be different. Back in 1978, when I first started practicing the law, it was very clear that the law is broken in family law to say you don't consider fault in the family law. You have to wait at least 48 hours to get a hearing on all remaining issues. Well, that's evolved over the years and no one really considers that to be important anymore, especially since the changing grounds. But in this case, in this case he suffered. He suffered because of what he did. Now there are three areas which we think the rules didn't apply to him on the court the same way it applied to the wife. And one of the particular areas, my first point, is that the wife admittedly took over control, lived solely in his non-marital home, because they only married about five years by the time the divorce was filed, lived in this home he had before the marriage, it was current in its payments, and once she started living there from the very first day she was responsible for payments, she made no payment. Well, let me ask you, you say she was responsible for payment. It wasn't her house. What made her responsible for payment? Because she was in control of the house by agreement and she lived there. I think she had an obligation to prevent an asset, whether marital or non-marital, from being disposed of. Participation of assets only applies to marital property, doesn't it? Well, there's another paragraph in File 3 that talks about that they're responsible for any increase or decrease in value of a marital or non-marital asset. So if she was not going to live there, I get it, but if she was living there to the exclusion of anyone else, and she was not paying the bills, and she had money to pay the bills, then, yeah, I think she's responsible for it, because we are required, because it creates a new species of property once a divorce is filed. There's a creature called marital property that doesn't exist other than during the period from the beginning of the divorce to the end of the divorce. But also we have a new responsibility, that is to make sure that non-marital assets in our control, in our possession, and it was in her control, and in her possession, are not lost, they're not decreased in value, and part of it is because the court wants to sort it out, and during that period of sorting it out, the original statute was saying there's an injunction, automatic injunction, well, that was found not to be constitutional. So, but now we still deal with this, that you've got a responsibility if you are sole possessor of this property. So I think she does have that responsibility from the very beginning. And you think that's under 503? Correct. Under 503, there are a few to say. We're sure she has... 503 being one, or 503 being... I don't have that in front of me, I apologize. But you think that she has a duty under the law, if you would, to not allow non-marital property to decrease in value? Correct. And one of the reasons is that until we sort it out, people sometimes hold on to other people's property. And what we don't want is a lot of self-help with people coming in. I mean, you could take it to its extension and say that he, then I guess Mr. Rasmussen could have filed for a notice for possession and a forcible entry and detainer, but that didn't happen. And it was agreed that she was living there. Now, to add to that, she added her boyfriend for 12 months at that time, so she knew that she wasn't going to pay, she knew that her boyfriend was living there, he wasn't contributing to it, so basically they allowed that property to depreciate in value and lose value and decrease in value because they didn't pay the mortgage. She knew there would be a foreclosure. At the time of the hearing, she knew there would be a foreclosure and she said, you know what, I don't care, it's not mine. But he was not in a position to go and save it, so it was in her possession. Had she said, tenured it to him, that would have been different. But wasn't he in a position to save it? He gave her money. He was in jail. I know, but he had an attorney. He didn't give me money to pay it. No, but that could have been facilitated through his counsel. He didn't know it wasn't paid. That's the one problem. He didn't know it wasn't paid because the mail was going to her. She was getting it. But at some point he did know it was not being paid because he gave her the money. $50,000, right. When we found that out, the agreement was that he tenured the property over to her to save the house. So the question is, can she be forgiven or can you ignore a foul committed by her in that marriage by allowing a marital or non-marital asset to decrease in value? And she did substantially. She lost it. It was gone. It was no longer available to him. It was his before the marriage. And it's at a time when she claimed she had no money to pay it. But if you look at the amount of money she was given, in addition to her salary, she was making about $3,700 a month, plus she had $50,000 given to her, plus she had another $9,000, plus she liquidated, this is all about court order, her state university retirement account, of which a third was marital. And she just did it. And she had the money. What did she do with the $50,000? Good guess. I have no idea. We tried to find out what she did with it. We don't know. She certainly didn't pay the mortgage payment. So we know that didn't happen. We know she also gave away or sold my client's non-marital boat to one of her ex, not ex-husband, but an ex-boyfriend who was the father of one of her other children. So we know that she had the money. I don't see that as an issue that you raised. Which one here? What's the word? She dissolved her retirement fund? That's correct. It was partly marital plus the boat? I don't see that as an issue raised. I raised that in the allocation of property in saying that when you look at the chart for how much she got, and you look at the 503G trust, which goes into the other one that the court created, the 503G trust was created because of the needs of the children who at that time were all going to be reaching Asian majority in three years. Well, I see where the father wanted to allocate $100,000. Correct. And believed that that was the correct amount. But all these other things that you're arguing, I don't see where they've been preserved except for the decrease in non-marital property. I don't see these other things being preserved. And it wasn't our intent to necessarily preserve them as separate issues, give us this, but it was to be considered in the whole picture in terms of the allocation. The allocation is unfair because the court took then part of it, and I'm going to hit all of these if you don't mind. Well, I think from my point of view at least, in order to understand what you want in this case, I am looking at the issues raised, one of which is the assignment of a value to the marital portion of the thrift savings plan, which is a specific thing. Correct. The dissipation of the specific house. Correct. And then the creation of the 503G trust. So I don't see where you've claimed that the entire allocation was somehow unfair. Are you asking us to review the entire allocation now and somehow come up with a different number or result? No. What I'm saying is, and I probably didn't do a good job at this, what I'm saying is that as far as the allocation of a marital portion of the property in the end of the pension, there's no way that that thrift plan could have been calculated that much. There's no evidence. The judge had to have concluded that there was about $28,000 a year contributed to his thrift plan when he made gross a little over $80,000 a year. So that would have been, had it been net, because we do know those numbers. We don't know that he contributed $28,000. The court just accepted a number by the wife. And there was nothing to support it whatsoever. And she didn't have any evidence to support it. What he did do was usually contribute about 5%, which meant the bulk of it was before the marriage. Because the marriage was in 2010. So the court allocated $28,000 a year, gave the wife, and I don't remember the exact number, but $78,000 considered as her one half of the marital portion of his thrift plan. And there's no way he could have contributed that. The simple math wouldn't add up to that. With regard to the 503G Trust, and that's where all these other numbers in the table I've provided, is to explain how it is impossible for that amount of support to be a reasonable amount of support for those two children for the remaining three years, even if they went through college. If you considered the wife, the mother of the children, had an obligation to contribute, if you considered the support amount, the support amount wouldn't have been that much. So what it was, it was confiscatory. Because out of my client's thrift plan, he got 4%. She got 96%. And that's considering that portion that was given to her in the 503G Trust to manage. And he would have had no problem with her managing it at $100,000 because he felt that that probably would be an amount that would be appropriate. But when the court gave him the entire amount, then he felt there was a problem because that only gave her an incentive to do what she did with the house, what she did with his boat, and what she did with other things. And it's just to cash it out without any responsibility. And that's not the purpose of the 503G Trust. The purpose of the 503G is for a very specific purpose. My gosh, he should have one. There should be one. We're not doubting that. But the purpose of it isn't to enrich them beyond what would have occurred had this marriage not been dissolved and had this status not been what it was. It's to adequately provide for them had that been intact. And they wouldn't have spent $20,000 a year on those children. They wouldn't have spent that much. But when you create this trust, do you reduce the number to a present cash value? It is a present. It was a present. It was a thrift plan. So it's kind of different. So I mean, when you figure out what number should be allocated for the children, if they need $300,000 over the next six years, then do you take that and reduce it to present cash value, that is, the amount of money that could be invested to provide for the children on a yearly basis? It's a great question. I don't know what the court did. Our impression was that we gave them current dollars that would actually, if they invested it, would actually exceed what they needed. Well, what is the law on that? Do we know what the law is in creation of these trusts? You know, like we do when you settle a minor's case in a personal injury action, or you prove your damages on a severely injured person who's going to need care the rest of their lives, the law requires we reduce it to present cash value. What about in the divorce setting? I think it's what you say it is. I don't know that there's a rule of thumb. It's what we, the court, say it is? Right. You don't know of any case law on this? I don't. I don't have anything to offer on that. But the bottom line is the amount that would have been paid to them had he been intact, had it been an intact family, was exceeded by what was awarded. They would not have gotten... I mean, the mother, it stretched credibility. She said at one point it was $2,000 a month for the kids' activity fees. There's nothing to support that. And finally, a trial, a cross-examination, she lost more like $300. But she never produced one receipt, never produced one document, never produced anything other than her guess on it. So it lacked a factual basis other than her guess. So when the court was... For someone to make a guess, the guess was $247,576. I mean, you know, if somebody's making a guess, you usually see it rounded like $300,000 or $250,000 or something like that. It's a pretty specific number. Well, it's the balance. It was the whole count. The guess was, this is how much it costs for activity fees. This is how much it costs for this. And they had no proof behind it. So what you're saying is after she got her allocation, whatever was left was for the kids. Right. And that's how it worked out. Oh, yes, absolutely. And that's what the problem is because I don't think it was designed to be punitive. I think it was easy sometimes to look at the rules differently for my client because my client was the bad guy. He's the guy who committed acts that caused him to go to jail. So I think it was easy for them. Thank you, counsel. Thank you, Brian. May it please the Court, for the audio record, I'm Kirk Blood and I represent Christy Rasmussen. We ask that the Court affirm the judgment in all respects. I'll take a shot at that present value thing. The numbers came from Christy's position statement and her testimony on the factors in her position statement. The numbers were all based on her current expenses and the big ticket, the university, was based on today's undergraduate tuition. So presumably money for the tuition will be set aside. It will grow. Presumably tuition will grow. But it was all done at today's numbers. She testified as to how much her expenses were for taking care of the kids. Today, not what they would be. Everything was done on today's values. I hope that helps. How did the Court arrive at 247,576? Did they take your client's presumed distribution and just subtract it from the total? My client went through six different factors that expenses. No, I understand. Just go through each one. Health insurance, counseling, four-year education and SIU. I get all that. Right. My question is how did you arrive at the 247,576? Her testimony on each of those figures, those six numbers, that's what they added up to. I know, but the total in the account, as I understand it, was $339,327. Is that right? About 339-something, Your Honor. And how much did your client get? I think it was $78,000, but going home to that, I wasn't really thinking about it. $78,375. All right. So I'm just wondering if Mr. Fahrenkamp is correct that the Court just awarded the remainder to the children, to the trust. I mean, I never looked at it that way. That's what I'm asking. Well, to be painfully honest, I hadn't either. I mean, I never heard that until I walked into the courtroom here a few minutes ago, and I didn't realize there was a collision. That math doesn't work, so it couldn't be that way. That may be. It never occurred to me. Well, if he's right, I can see that the math doesn't work that way, so I don't know how the Court came up with that number, except based on your client's testimony. Well, then that's all there was. Did your client put forth, for example, the cost of health insurance? Her testimony. Which was unrebutted. Yes, but she was crossed, and it was not rebutted. Correct. Okay. And that's what troubles me coming in today about the claims that we're getting is unrebutted stuff, matters that the trial court, if he was hearing this, would say, what now? What are we doing here? I didn't hear about this. The trial court would be very surprised to hear he's in error, and he's going to have to redo things he didn't even consider. Excuse me. Palmer complains about the loss of his house, and he did lose his house, and, of course, as you've observed, Your Honor, that's non-marital, and therefore statute takes that out of dissipation. But as far as it affects the total property division, to say that she didn't shepherd the non-marital assets is the pot calling the kettle black. He went from an $86,800 a year job to nothing, and the family had to live with that. One of the first things is she lost her minivan. She repossessed. That's on the record. She had to quit her state university job so she could collect her retirement. She had kids living at home. She had teenage kids. Sudden loss of $86,000 a year, and she was in a spot. And she said that she did not care that he lost his house, but she also said she couldn't pay it. That's $250,000 that he gave her. Your Honor, living with two kids is expensive. It's just expensive. She was crossed on that extensively. That was the main focus of the cross. She said it's just expensive. She was looking for a house to rent. She was getting by the best she could. She quit. She quit her state university job to collect the retirement, to get the cash for the retirement, $60,000, which, by the way, she didn't have. It hadn't paid out yet. But she did that. That's pretty desperate. She's a fairly young person, and she left that retirement to get the cash to pay for the kids. Speaking of cashing the kids, this trust corpus is a drop in the bucket. One of the kids wants to be a physician. A physician. And this tuition is just based on four years at SIUE. That's all it is. And, by the way, it's half. It's not all of. She figures she's got to come up with half, and he's got to come up with half. This was half the four-year tuition times two kids. That little kid that wants to be a physician is going to be up to her ears in debt. If there's an issue about what's going to happen to the corpus that's left over, that's a joke, right? Because somebody wants to be a doctor, there's not going to be anybody left over. There's not a chance. All of this is very speculative at this point. I mean, you know, there could be scholarships. You know, it just seems very speculative. I think the more important question is how the court arrived at this number. And, you know, in other areas of the law, we have experts who come in and accountants, and they tell us what present cash value is needed to pay for X. Maybe this is the correct amount for medical school if it's invested wisely. Who knows? But the problem is, who knows? Well, yes, and I'll say this, that the judge wasn't offered any alternative method. He was faced with uncontradicted numbers. There was no alternative. The alternative was he said, well, I think $100,000 is enough. He testified to that. That's it. That's it. What was the court to do with that? She testified that she reviewed his financial discovery and that he was contributing $28,000 a year to his savings plan. That's a lot of money. Is that true? Is that true? Did that really happen? Well, it's unrebutted. He took the stand after she did. Didn't say a word about that. Didn't say a word about it. And now we're getting that that's wrong. But even now, where is that evidence? Where is it? Where is the evidence of what he contributed if he didn't contribute what she said he contributed? I looked it up online. I put one of the online government sites in my brief. And the fact is, if you're paying into a thrift savings plan, it's on your W-2. It's on your stubs. Where's his W-2? Where's his stubs? Where's his evidence? We're not even getting his testimony, which would have some value. It could be. I mean, if they disagree, then he doesn't have to be believed. He can be disregarded if he didn't say anything. Counsel says how much it was. But that's all we've got. Well, I say it was a million. I'm counsel. It was a million dollars a year. What the heck? I'm counsel. There's just nothing. There's nothing. There's just nothing to go on. We're a little troubled by child support. And I know that this court has taken an interest in child support. And now we're getting a claim that the court erred in figuring child support. And I want to emphasize that the court wasn't given any contrary analysis of the child support amount. Dwight testified as to how much he made a year, uncontradicted, and how much the net was, and what the 28% for child support should be. Hosdall's position at trial wasn't that it should be a different amount. His position at trial was that by statute it was evaded because he was a prisoner. But that's not true. That's not true by statute. It's discretionary. Actually, the language is if the parent is incarcerated, there's a rebuttal presumption that he doesn't pay child support. Well, that's how our legislature says discretion, right? And it wasn't briefed, so I did not do a workup on that, although I did note that the nine in case, N-E-I-N, is probably the foremost case pointing out that the trial court has the authority to impute income to an incarcerated parent. But again, no contrary presentation on child support, just setting it for appeal. And I heard the statement about how the rules have got to apply to everybody, and they do. This court has rules, too. And one of those is that we don't sandbag the trial judges, that we give them a fair shake, too, in that when the case is over, they've gotten the arguments. They've made the decision based on what they were faced with. And then this Court has a decent record and can do the right thing by the parties and the judge. And in this case, it just wasn't done. It just wasn't done. I think the Court understands our arguments. Again, we don't see any reason this case can't just be affirmed on all issues. Thank you, Your Honor. Thank you. We're both? Thank you. The expenses were so bad for the wife that she didn't charge her boyfriend for living there for a year. She just couldn't afford it. That's how bad they were. She was able to front him living room and board and not charge him. That's how bad her expenses were. She gave up almost a $4,000-a-month job because she had to cash in that retirement account. She cashed in the retirement account. She left her job. She left the job that would give the kids free education, free college education. And that's the testament. That's the record. When she left that, she gave up that opportunity. So it stretches belief to say she quit that job because she didn't have money to support a house she wasn't paying for anyway. So with $4,000 plus the cash that was distributed to her immediately, like $17,000 immediately, plus another $50,000, she just couldn't make it. She just had to give up her job. That doesn't make sense. The idea that the children may or might go to medical school or something exceeds what parents are normally ordered to do. They're not ordered to pay for medical school. Free college and legislature's guidance by the cost of it. And that cost would be the cost of going to the University of Illinois at Champaign. And there are specific things that are out there. And that's speculative at best. Again, it doesn't answer the question, how come to the dollar the judge entered the order? The only reason he did that is he wanted to punish my client. And he wanted to give every single possible dollar into that fund to punish him because there's no mathematical connection to it. The statements made many times that there was nothing presented by the husband. I have to understand, all the mail went to the wife. He didn't get anything that was normally going to people. He was in jail. She had access to every account, every statement. Well, he did get money that was his. He got some money, but not nearly what he should have gotten. Well, I understand. But to say he got nothing isn't really fair either. It's not fair to say nothing. I agree. He got something, but in comparison to what he should have gotten, it was barely there. Even the wife's statement, as far as income or what, she was asked about FAFSA. What about the FAFSA forms? What's going to happen if there's this $200,000 account here, and what's going to affect it? She didn't know. She didn't care. She just had that number, which happened to be the balance that was in that account, other than the distribution the court already gave to both of them as being married, which also was erroneous. What about their argument that you've raised much of this for the first time on appeal? Which was raised for the first time? Because I disagree with that. I think that what happened is we talked to the judge in the beginning about the 503G trust not being the right amount. As far as the child support, we agree there should be child support. He never backed down from his responsibility saying, yes, that's correct. It's just the amount the court came up with was unconnected to the evidence. The wife, when she testified, they testified like she gave us all these details. She gave nothing. She gave a few things that she concluded in her position statement. You know, if we're going to follow rules, a position statement is not evidence. It's like an opening statement. Just like we instruct juries, an opening statement is not evidence. To say that that consists of evidence is just wrong. Did she testify to the facts in this position statement? Some. Some she had no basis for. There was no foundation. She was crossed on it and it was found that she had no basis. And the stuff we did cross on was found to be exaggerated to the nth degree. I mean, phenomenally exaggerated. And it was clear that she was shooting for the moon and hoping for it. And she got it. Thank you. Thank you. Thank you, counsel, for your arguments. The court will take this matter under advisement and render a decision in due course.